IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

_____

| | | |
|---|---|---|
| JOEL ALFRED ST. GERMAIN, | ) | Cause No. CV 12-108-M-DLC-JCL |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | FINDINGS AND RECOMMENDATION |
| | ) | OF U.S. MAGISTRATE JUDGE |
| MIKE FERRITER, Director, | ) | |
| Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

_____

On June 21, 2012, Petitioner Joel Alfred St. Germain filed this action seeking a writ of habeas corpus under 28 U.S.C. § 2254. St. Germain is a state prisoner proceeding with counsel.

On June 22, 2012, Respondent ("the State") was ordered to file an Answer. It complied on August 22, 2012.

## I. Background

St. Germain was charged in the fall of 2003 with four counts of incest and four counts of sexual intercourse without consent. All charges involved his stepdaughter,

H.,[1] and all occurred in Ravalli County between June 1, 1998, and May 27, 2003.

Attorney Kelli Sather was appointed to represent him. Following a four-day jury trial in June 2004, he was convicted on all counts. On each count, he was sentenced to serve 100 years in prison, with 25 years suspended. All counts run concurrently. He will be eligible for parole after serving 18 years and nine months. Judgment & Commitment at 3-5 ¶¶ 2-10, *in* Appellant Br. 04-869 (doc. 8-6) Ex. A; Mont. Code Ann. § 46-23-201(3) (2003).

St. Germain appealed. On February 6, 2007, the Montana Supreme Court affirmed. *State v. St. Germain*, 153 P.3d 591, 600 ¶ 44 (Mont. 2007). St. Germain's conviction became final on May 7, 2007. *Gonzalez v. Thaler*, __ U.S. __, 132 S. Ct. 641, 653-54 (2012); *Bowen v. Roe*, 188 F.3d 1157, 1159 (9th Cir. 1999).

On March 22, 2008, St. Germain filed a petition for postconviction relief in the trial court. Appellant Br. 11-0214 (doc. 8-8) at 4. The trial court denied relief. On April 17, 2012, the Montana Supreme Court affirmed. *St. Germain v. State*, 276 P.3d 886, 900 ¶ 74 (Mont. 2012).

St. Germain filed his federal petition on June 21, 2012.

---

[1] Persons who were minors at the time of any of the incidents described are identified by one or two initials.

## II. St. Germain's Claims

St. Germain makes three claims of ineffective assistance of counsel at trial. First, he says, Sather failed to understand her investigator could not testify about H.'s credibility[2] and, to ensure the trial court would permit her to call him at trial, she produced to the prosecution the investigator's notes or reports of his interviews with witnesses. In fact, she was not required to produce the notes, and the prosecution relied on them to call witnesses prejudicial to St. Germain. Pet. (doc. 1) at 18 ¶ 1.

Second, St. Germain asserts that Sather failed to obtain the testimony of a medical expert who would have testified that H.'s claims of long-term sexual abuse were inconsistent with her physical examination. *Id.* at 19 ¶ 2.

Third, St. Germain contends that Sather failed to request a pretrial hearing to determine whether H. previously made a false accusation of sexual abuse against her biological father. *Id.* ¶ 3.

## III. Facts Presented at Trial

Law enforcement became involved in St. Germain's relationship with H. on May 27, 2003. At 9:52 p.m. on that day, St. Germain called 911 to report that his stepdaughter and her friend L. had left his home a few hours before and failed to

---

[2] Testimony about H.'s demeanor when interviewed would have been permissible, *e.g.*, 3 Trial Tr. at 809:24-810:3, 815:11-15, but counsel said she wanted the investigator to testify about H.'s credibility, based on his many years of investigative experience, 4 Trial Tr. at 1244:1-1245:9.

return.  The dispatcher was surprised to learn that both girls were 19 years old.  3 Trial Tr. at 800:17-25, 802:13, 805:20-24, 806:21-22.  St. Germain later told police that he became concerned at about 8:00 p.m., because the girls had not yet called to say they were on their way home from the tanning salon.  He said the girls had called, as they always did, when they arrived at the salon, and they said they would stay about 45 minutes.  They always called before they left so he would know when to expect them home.  *Id.* at 817:4-19, 818:9-16.  The distance between St. Germain's home and the tanning salon was about seven-tenths of a mile.  *Id.* at 817:23-818:2.

Police were unable to locate the girls that night, but a few months later, H. contacted the Ravalli County Sheriff's Office.  *Id.* at 821:2-23.  She reported that St. Germain, her stepfather, perpetrated a long course of sexual abuse against her.  It began when she was 11, in Silver Bow and Missoula Counties, and continued from 1998 to 2003 at St. Germain's various residences and work sites in Ravalli County, including Stevensville, Lost Trail Hot Springs, and Darby, until the day she ran away at age 19.

L. and H. were the first two witnesses to testify at trial.  St. Germain also testified.  L.'s and H.'s testimony is described here in detail, because it provides context that is important in analyzing St. Germain's claims.

### A. H.'s Testimony

H. testified that St. Germain first attempted vaginal intercourse with her when she was 11, but H. protested that it hurt too much. St. Germain then took her into the bathroom and raped her anally. 2 Trial Tr. at 360:1-367:10. That was his usual method until H. grew old enough to tolerate vaginal intercourse. At that point, St. Germain would still rape her anally whenever he wanted to hurt her more. *Id.* at 389:25-393:12. H. said her mother asked her a few times whether St. Germain was "messing around" with her, but "she only asked me when she was drinking and she didn't really seem like she cared or believed that something was" going on. *Id.* at 404:15-405:5. St. Germain told H. that if she told anyone what he was doing, she should "make sure to tell them that you wanted it," because "we're in this together," and "you wanted it too." *Id.* at 405:10-18, 486:23-25. H. said, "He treated me like I did something wrong, like it was my fault, I was bad." *Id.* at 367:8-9.

H. also testified that, when she was seven or eight years old, her mother expected St. Germain to punish her when she misbehaved. He would make her hold a weight bar or her hands over her head for minutes at a time. If she broke the posture, she got more time. She cried. 2 Trial Tr. at 349:14-355:7. St. Germain and other witnesses corroborated this testimony. He said, "H. would cry right away." "You could yell at H. when she was younger and she would cry." 4 Trial Tr. at

1143:11-144:15, 1152:13-1153:8, 1229:21-1230:18.

St. Germain also taught H. karate. "That's what it was supposed to be, but it was mostly how much pain, you know – He said how much pain could I endure, like [he] wanted me to have a high pain threshold." 2 Trial Tr. at 376:9-13. "[H]e never asked, Do you want to do karate now? It was just it's happening. This what we're doing right now; I'm teaching you." *Id.* at 398:15-23 (paragraph break omitted). But he lost his temper if she was too good. "If I would hit him too hard, he would hit me or make sure that I knew. I would be crying, and he'd leave bruises. One time I hit him in the stomach, and he hit me as hard as he could." She thought he broke one of her ribs, but at any rate "it was bruised, and it hurt really bad." It took a long time to heal. *Id.* at 398:2-10. L. corroborated this particular injury. 1 Trial Tr. at 176:1-9 ("H. is just real petite and stuff, and you can't slam – a big man can't slam someone in the ribs like that."). St. Germain corroborated some of this testimony as well. He admitted it sometimes seemed "like [H.] didn't want to spar," but that would not make him stop. He agreed he "went a little too far sometimes." 4 Trial Tr. at 1220:2-10. He testified:

Q.    As she got older, you taught her karate, didn't you?

A.    Yes, sir.

Q.    You would bruise H., wouldn't you?

A.    Yes, sir.

Q.    It would hurt her, wouldn't it?

A.    Yes, sir.

Q.    And you told her and other people that was to help her have a higher tolerance for pain, wasn't it?

A.    The bruising, sir?

Q.    The hurting her.

A.    Hurting her was not a purposely done thing.

. . .

Q.    And did she – Would sometimes she instigate or start the sparring with you?

A.    I would not say she instigated it, no.

4 Trial Tr. at 1230:19-1232:3, 1239:2-4; *see also, e.g.*, 3 Trial Tr. at 707:2-16 (R.M.), 758:20-759:9 (Yorton), 950:2-23 (Tubbs); 4 Trial Tr. at 1014:11-1015:7 (Jones), 1023:17-1024:5 (R. Gillespie), 1033:12-1034:5, 1044:4-11, 1045:16-24 (C. Gillespie).

But the leading characteristic of the public relationship between St. Germain and H. was that they were almost always together. St. Germain installed carpet and tile flooring. When H. was younger, he took her with him to "pick[] up carpet scraps. But when I got older, I could nail down tack strip or carry rolls of carpet. Then I got

to the point where I was stretching carpet.  Then right before I left I was doing seams in carpet." 2 Trial Tr. at 426:12-17.  "He told people I was getting $8 an hour," but in fact St. Germain only gave H. the amount of money he wanted her to use at the time, to buy clothes or lunch at school.  *Id*. at 427:19-428:4.  H. went to school without St. Germain, of course, but she was not able to participate in extracurricular activities. *Id.* at 635:22-638:20 (Rokusek) ("H. had no after-school life.").  "I wanted to be in all the plays.  I wanted to, you know, go to dances and games, after-school stuff," but St. Germain would say, "I have to work, you know, and you have a job.  What am I supposed to do?"  So H. "just . . . stopped asking.  I knew what the answer would be."  *Id.* at 428:14-429:11.  St. Germain often picked H. up from school in Darby, and "we'd go to Missoula and work."  She also worked on weekends. *Id.* at 427:3-18.  She often showed up in odd places with him, and one of her teachers at Darby High found she sometimes did not do her homework because she had been with St. Germain, working.  2 Trial Tr. at 629:10-631:4 (Jones).

For H.'s senior prom, St. Germain took her and L. out to dinner, then drove them to the prom where H. met her "date," whom St. Germain approved after H. described him as unattractive.  The girls stayed about two hours, then St. Germain picked them up and drove them home early.  *Id.* at 434:8-435:15; *see also id.* at 334:11-15 (L.).  For L.'s senior prom the following year, H. wanted to go even though

she had already graduated. St. Germain picked a fight, yelling and throwing things, and almost stopped them from going. *Id.* at 436:2-23. A neighbor stopped by and offered them a ride. At that point, St. Germain gave in, although L. described him as behaving, "[y]ou know, like, You shouldn't have left me home alone. He was, I'll just stay here by myself." 1 Trial Tr. at 179:15-186:14. When a detective asked St. Germain about this incident six months later, she observed that St. Germain "still seemed to be upset . . . . about H. going to the prom." 3 Trial Tr. at 815:1-20.

### B. L.'s Testimony

In April 2002, when L.'s parents moved to West Virginia near the end of her junior year in high school, L. moved in with H. and St. Germain so that she could graduate the following school year from Darby. In exchange for room and board, L. agreed to watch H.'s little brother D. after school and to pitch in with household chores. Her presence was helpful, because H.'s and D.'s mother had "just moved out a couple of days before [L.] moved in." 1 Trial Tr. at 160:23-162:25.

L. looked forward to living with H. and being roommates. But she soon discovered that the arrangement was not going to be what she expected. She and H. "could never really be alone by ourselves and talk." 1 Trial Tr. at 166:15-16. "[I]n about the first week," L. took the funnies out of the daily newspaper to read them. When St. Germain and H. arrived home, St. Germain "said that he reads the paper

first, no one else – you know, he gets the paper first." L. thought he was joking. But "he got really upset and stormed out of the room," expecting H. to follow him. "And he started screaming at H., you know, telling her, Why didn't you correct L., you know? You know I get the paper first." *Id.* at 164:10-165:2. St. Germain would only let the girls go together to the grocery or the tanning salon. He did not forbid them to go anywhere or to have friends over, but he would always come up with some reason they could not do things. *Id.* at 167:12-168:2, 171:24-172:12. He behaved "like a little kid who nags at their mom for something: please, please, you know. And you . . . . give in, you know, just to keep the tension low and keep some peace in the household." *Id.* at 170:10-14. While L. had participated in school activities in previous years, St. Germain demanded that she return home immediately after school to watch D. *Id.* at 178:13-179:14. Other witnesses confirmed that L.'s behavior changed and she was always tired after she began living with H. and St. Germain. *E.g.*, 2 Trial Tr. at 535:8-536:16 (K.), 639:5-640:1 (Rokusek) ("part of the deal of living in the home" was "that she had to go home after school"). Although St. Germain had promised to pay L. $100 a week, he did not. 1 Trial Tr. at 231:24-232:12. L. sometimes found herself at home with D. with nothing to eat and no money to buy groceries. St. Germain dismissed her complaints, telling her "there's food in the house." *Id.* at 171:1-10. To buy shoes for D., L. used her own birthday

money, sent to her by her parents. *Id.* at 171:11-23. "Always all of the attention was always on Joel constantly." *Id.* at 173:10-11.

One day, when H. and L. were alone in the kitchen, H. said, "I hate him. . . . I can't stand him; I hate him." L. said, "Well, why didn't you ever run away? If you hate it so much, why don't you just run away?" 1 Trial Tr. at 188:14-189:6. L. testified:

> [I]t wasn't like, hey, you know, that day that's what we were going to do. But it was kind of out there now. I had said it; and she told me, you know, she really thought about that.
> Every time we got alone together somehow that conversation would pop up then. You know, some day we might leave. First it was, some day we should do that, leave. And then it was, You know, maybe we should leave sooner, you know. Then it was to the point where we had a date we were going to leave. . . .
> [M]y parents still lived in West Virginia. So I figured, you know – My parents loved H. to death, and I figured that's the place we're going to go. And I moved across country so many times – I mean we moved a lot – that I knew I wasn't afraid to drive across country because I'd done it so many times.

*Id.* at 189:10-21, 189:24-190:5.

H. and L. "kind of listed the pros and cons of leaving" and "made enough time to where we could get some clothes and get concrete plans and . . . [L.] could graduate," so that she "wouldn't have to repeat a year or something like that for leaving." 1 Trial Tr. at 191:11-19. About a month ahead of time, L. started sneaking their things out of the house – clothes, CDs – bit by bit, in her backpack. She stored

them in her locker at school "until it got a little full and someone would notice why I got all this stuff in my locker." She asked a friend, K., to keep things at his house, and he agreed. *Id.* at 190:12-191:7. L. was the class salutatorian and planned to speak at graduation. *Id.* at 191:23-192:1. But "[a]ny point that we felt comfortable leaving after I graduated, then we were getting – you know, that was it." *Id.* at 191:19-22.

A week or ten days before graduation, however, the plan "kind of changed." 1 Trial Tr. at 191:22. It "went from graduation to any possible chance we had." *Id.* at 204:7-10. H., L., D., and St. Germain were getting ready to go up to the hot springs to swim. L. said:

> I was in the room folding up towels and getting D.'s swimwear and things like that. Before H. walked in the room, Joel had found this little tank top or something and asked H. if that was hers. And she kind of like, Yeah, and grabbed it and walked in the room. Then he kind of asked her to come back out of the room. You know, I didn't go with them.

1 Trial Tr. at 193:2-9. L. said St. Germain and H. had done that before: "I'd walk into the room . . . . [and the] two of them would be talking and then stop." *Id.* at 194:13-15. When they got to the hot springs, L. asked H. what St. Germain was talking to her about:

> I was like, Why does he keep pulling you aside and talking to you and stuff?

She was like, Because he wanted to know how come I won't wear this shirt for him, because she always wore baggy clothes.

She's a little, skinny girl. In high school, too, usually they wear hip-huggers and stuff like that. H. never did. She wore big, baggy sweaters and stuff to hide her body. So she had this little tank top. So he asked how come you don't wear this for him.

. . .

She kind of looked funny, like she didn't know what to say.

I asked her – You know, I felt it in my heart. I was like, Is something going on between you and Joel?

She was like, Yes, there is, and started crying.

I was like, Do you have a relationship; or, you know, what's going on?

And she said that Joel had been molesting her. And I said – You know, I was, like kind of – You know, I didn't know what to say.

She said, Since I was 11 years old.

1 Trial Tr. at 193:14-24, 194:22-195:10.

L. said H.'s disclosure "wasn't so much of a shocker because I already had kind of suspected something in the house like that." 1 Trial Tr. at 195:12-14. For instance, one day while L. was cleaning up and doing laundry, she had found H.'s pants and underwear by St. Germain's bed "like she had pulled them down, you know, stepped out of them, and they were left just like that." *Id.* at 196:1-17. She found H.'s pajama pants in St. Germain's bedroom on another occasion. On a third occasion, she found blood on balled-up clothes in St. Germain's bedroom. Her father had colon cancer and polyps, and she thought the stain looked like her father's clothes when his polyps bled. She washed them, but she asked H. whether St. Germain was

ill.  H. talked to St. Germain, and then St. Germain told L. that the cat, Stella, had bled on the clothes and, as Stella was very ill, he "was saving those because those were his cat's memories, his cat's clothes," and he did not want to wash them.  *Id.* at 198:17-200:15.  L. "started crying.  I was so frustrated because he made me feel guilty for washing those clothes. . . . I was ready to say, What are you thinking, telling me that they're from your cat, you know?" *Id.* at 200:16-18, 201:8-10.  Only later did L. think, "Stella never bled. . . . Who would keep their cat's bloody, you know, clothes in their room?" *Id.* at 200:25, 201:3-5.

L. also testified that St. Germain would frequently comment on H.'s appearance or say, referring to the two of them, "I got two virgins in the house and can't do nothing about it." L. said, "You know, to me that's not something my father would say." *Id.* at 202:5-17.  L. added, "Just always being alone or they're working together all the time.  I always thought that was strange." *Id.* at 202:18-25.

On May 27, 2003, St. Germain called L. and told her he had received an electrical shock at work and needed her to come pick him up.  H. stayed to clean up the job site, arriving home later.  St. Germain was asleep.  1 Trial Tr. at 205:2-20.

> I was like, This is perfect.  He's sleeping in bed, you know.  And we're babying him, and he's got a good attitude.
>     He wasn't arguing.  There wasn't no tension, nothing that day.  It was a pretty good attitude.  And we went tanning all the time, and so we asked if we could go tanning that night.  And that's when we were going

to leave, is we were going to say we were going to go tanning and leave.

1 Trial Tr. at 205:22-206:6.  They left for the tanning salon.  "We had to call when we got there, which the tanning booth was maybe only half a mile away.  But we had to call when we got there and call when we left so he knew how long – if we were doing something we shouldn't be or whatnot."  *Id.* at 209:17-22.  They called and said, "We're at the tanning booth.  We'll see you in 45 minutes."  But they were not at the tanning salon.  L. called K.  They met  him off Tin Cup Road, got their things, and left.[3]  They met another friend of H.'s, Yorton, who went with them to Whitehall, about three hours and fifteen minutes from Darby.  They stayed in a motel there for a few hours' rest, then drove the rest of the way to West Virginia.  *Id.* at 210:8-211:14.

## IV. Analysis

To avoid placing any undue burden on St. Germain under 28 U.S.C. § 2254(d), and despite the probable untimeliness of his petition, all of his claims are addressed

---

[3] K. testified at trial.  He said the girls "asked me to keep it very secret. . . . They didn't want Joel to find out.  They were afraid he was going to track them down, find them, bring them home, send the cops after them, something.  And so it was meant to be very secret."  2 Trial Tr. at 542:14-20.  K. met with the school counselor and St. Germain a couple of days after H. and L. left.  He said the police knew, apparently from traffic cameras, the girls had gone up Tin Cup Road shortly before they disappeared.  K. was the only one of their friends who lived up Tin Cup.  "They asked me if I knew where they went, and I told them I knew they left; I knew they were fine.  But I wouldn't say where they went."  *Id.* at 543:1-11.  St. Germain phoned K. several times after that, but, K. said, "[h]e wasn't very nice about it.  It was – it felt more hostile.  So I didn't give him any information."  *Id.* at 544:4-18.

here on the merits and *de novo*. Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). St. Germain must show both that counsel's performance fell below an objective standard of reasonableness, *id.* at 687-88, and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "[T]here is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

Not surprisingly, the State's evidence at trial was based essentially on the testimony of a single witness, H. Defense counsel was certainly caught flat-footed on more than one occasion at St. Germain's trial. But in state postconviction proceedings and in his federal petition, St. Germain had the opportunity to show – or at least allege facts that, if proved up, *would* show – a reasonable probability that the jury would have found reasonable doubt and acquitted him but for counsel's errors. A "reasonable probability" is *less* than a preponderance of the evidence. *Strickland*, 466 U.S. at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case."). The trial transcript does not support such a possibility, and St. Germain neither produces nor describes any evidence that could have shifted the weight of the evidence presented to the jury at trial.

## A. Investigator's Reports

Although the record is far from clear as to what happened and why, for the sake of argument I assume defense counsel's conduct was unreasonable when she gave the prosecutor the defense investigator's reports of his interviews with witnesses.[4]  I also assume that the prosecution would not have called Ron Hale as a witness were it not for the defense investigator's report.  St. Germain asserts that defense counsel's disclosure of the investigator's report of Hale's interview led to the introduction of highly prejudicial evidence against St. Germain.

As to the latter point, St. Germain is correct.  Hale worked with St. Germain for about eight months before May 27, 2003.  At that time, H. was 18 or 19, she was no longer in school, and she was working with St. Germain full time.  Hale testified that St. Germain "wouldn't leave us alone on a job" and "made sure" that H. "was always with him."  If St. Germain left a job site to get supplies or lunch, H. went with him.  Hale said he was alone with H. "[m]aybe once or twice.  Twice probably."  3 Trial Tr. at 680:21-23.  Still, St. Germain warned him "not to try anything" with H: "He just said that he was worried about being able to – How do I put this?  I don't

---

4 In the state postconviction proceedings, the State apparently argued that Sather was indeed required to produce the investigator's notes or reports under Mont. Code Ann. § 46-15-323(6)(c), (7) (2001).  Order Denying Postconviction Relief (doc. 8-11) at 38.  The trial court found otherwise.  *Id.* at 43.

know. Guys have their way of getting around things and making girls do stuff, and he just wanted to make sure that we weren't doing anything." *Id.* at 681:25-682:5. St. Germain commented to Hale, "[N]ot very often you're going to find a 19-year-old virgin." St. Germain made that comment "more than one time," and he made it "in front of both [Hale] and H." St. Germain even told Hale he "had a test done on her . . . that confirmed her as being a virgin still." *Id.* at 680:16-684:15.[5]

This testimony was, in a word, creepy. It is unreasonable to suggest that Hale's testimony, on the whole, was more favorable than not to St. Germain. *St. Germain*, 276 P.3d at 891 ¶¶ 17-18. Hale strongly corroborated the prosecution's picture of St. Germain as a man exerting and displaying total control over his stepdaughter and obsessed with H.'s sexual exclusivity.

But other evidence against St. Germain painted that picture vividly and completely. St. Germain, after all, directed H. to call when she reached the tanning salon seven-tenths of a mile away so, as he put it himself, he would know "they made it inside the building okay." 4 Trial Tr. at 1208:14-18. He considered it a 911 emergency when the girls had not returned by 9:52 p.m. He "was concerned because of them going down by the bar" near the tanning salon and "had concerns because

---

[5] St. Germain confirmed that he discussed H.'s virginity with Hale. 4 Trial Tr. at 1222:23-1224:2.

there was a lot of Mexican groups and stuff" in town. 3 Trial Tr. at 817:1-7, 818:17-22; 4 Trial Tr. at 1208:3-11. But he spent years teaching H. karate. He was an expert who was expecting her to hit back, but she could kick him in the face even so. *E.g.*, 2 Trial Tr. at 469:9-19 (H.); 4 Trial Tr. at 1023:17-1024:5 (R. Gillespie), 1033:12-1034:5, 1044:4-11, 1045:16-24 (C. Gillespie). She worked out almost every day. He knew that too, because whenever she worked out, there he was, working out right alongside and directing her, from the time she was 11 years old. 2 Trial Tr. at 360:6-16; 4 Trial Tr. at 1180:19-22. St. Germain's fears for H. were clearly abnormal.

And St. Germain's testimony did not stand alone. The high school principal testified that St. Germain angrily confronted him a day after a problem with some other kids on the school bus caused H. to arrive home late – by ten minutes. 3 Trial Tr. at 736:2-10. This event occurred when H. was a senior, 17 or 18 years old. The principal remembered that St. Germain:

> . . . was talking about he was angry and he could get more angry, that he was really trying to hold himself back.
>
> I listened and talked to him quite a bit and he did calm down, and we – It was quite a lengthy conversation where he was talking about, you know, how he worked with – how H. needed to be home because she would go to work with him and that he was teaching – I remember him talking about teaching her karate and how he was a black belt in karate and she was going to be a black belt and he was going to teach her how to defend herself. I don't remember exactly the words that were used and what was said.

3 Trial Tr. at 737:23-738:13.  Although the principal said, "[i]t was quite obvious to me that he was letting me know what he was capable of doing," *id.* at 738:21-23, his testimony also showed that St. Germain perceived some need – arising from the fact that the bus ran ten minutes late – to communicate to the principal that he was teaching H. to "defend herself."  H., too, clarified that St. Germain did not teach her karate because he wanted her to have a high tolerance for pain: "He would hit me until I cried so I would have a high tolerance of pain.  He didn't want me to cry."  But "[h]e taught me martial arts in case somebody tried to rape me."  2 Trial Tr. at 468:2-5.

Jason Yorton, a salesperson at Abbey Carpet between March and July of 2002, met H. and St. Germain in the store.  3 Trial Tr. at 746:7-11.  One day, Yorton got a note from H., "a little piece of paper that was folded up real small," saying, "Hey Baby, you're fine, or I like your smile," so he sent a note back to her.  H. was 18 at the time, and Yorton was 29, *id.* at 748:20-750:9, 773:13-19, yet they were passing notes to each other like they were at school.  The prosecutor asked, "Is there some reason why one of the mornings you saw her you didn't say, Would you like to go out on a date?"  Yorton said he felt he had to maintain with St. Germain "a very intense, serious controlling act all the time to make sure that my eyeballs and his eyeballs were locked up or the conversation was his subject or something he could have

input." St. Germain "always [had] the look of the jealous boyfriend" and was "flexing, just into looking physically dominant, being close, very serious eyes. And I was intimidated." *Id.* at 750:17-751:20. Yorton had a membership at the same gym as St. Germain and H., so he started lifting weights with them. At the gym, too, Yorton "made sure to keep my eyes on him," but "[o]n one or two occasions while Joel would be taking a shower . . . we had a little bit of time there to talk." *Id.* at 752:13-753:1, 754:9-12. Yorton stopped working out with St. Germain and H. around the first of the year in 2003, but on six or eight occasions, he got a phone call from H. when St. Germain was not around, and he met H., with L., at the gas station or tanning salon five or six more times before the girls left for West Virginia. *Id.* at 760:21-763:15. Yorton was well aware that time at the tanning salon was regimented: "When you get there, make a phone call; before you leave, make a phone call. And the tanning beds go for 20, 30 minutes." *Id.* at 763:20-25.

Finally, St. Germain displayed incomprehensible concern about H. and "boys":

Q. We agree that H. didn't have boys hanging around, did she?

A. There was one boy that did come by.

Q. One boy that came by?

A. Yes, sir.

Q. Which boy are we talking about?

A.   That was D.P.

Q.   A minute ago you said that was L.'s friend; right?

A.   Yes, sir.

Q.   Right.  H. didn't have boys hanging around her, did she?

A.   During the time of when she was 18 or 19?

Q.   During the time she lived with you.

A.   R.M. came over.

Q.   R. came over when he was a freshman and H. was a sophomore?

A.   But he's still a boy.

Q.   He is a boy.  Other than R., she didn't have boys hanging around, did she?

A.   She also had S.C. stop by.

Q.   Back when she was a sophomore in high school; right?

A.   Yes, sir.

Q.   Other than R. and S.C., she didn't have boys hanging around, did she?

A.   No, sir.

Q.   You told her boys only want one thing from her; right?

A.   Pardon me?

Q.   You told her boys only want one thing from her; right?

A. Yes, sir.

Q. They would have sex with her and leave her; right?

A. Not that they would have sex and leave her.

Q. They only want sex from her; right? That was your warning, wasn't it?

A. Yes, sir.

4 Trial Tr. at 1227:8-1228:23.

No doubt Hale's reference to St. Germain's "test" of H.'s virginity was disturbing and weird. But H., L., Yorton, the high school principal, and St. Germain himself all testified to similar signs of St. Germain's obsession with his stepdaughter's sexuality. There is no reasonable probability that, if only Hale had not testified, a reasonable juror would have found St. Germain not guilty.

Although St. Germain claims the State used the defense investigator's notes to sharpen its cross-examination of four witnesses other than Hale, he does not say who they were. Br. in Supp. (doc. 2) at 9. Since the Court has to guess, the State's references at trial to "Maki," the defense investigator, led in three instances to testimony that was cumulative and innocuous. 3 Trial Tr. at 939:3-14 (D. Drews); 4 Trial Tr. at 1026:8-23 (R. Gillespie), 1046:12-20 (C. Gillespie). In one instance, Maki's notes may have helped the State suggest the defense instructed its witnesses

to emphasize that St. Germain's work van was full of materials. *See* 3 Trial Tr. at 917:22-922:17 (W. Drews); *see also id.* at 697:6-698:7 (Hale). But, as a matter of common sense, that theory was not compelling anyway, as the van was also emptied throughout the workday. To whatever extent the State used Maki's interviews to "keep the witness honest," St. Germain was not prejudiced, because none of the witnesses was caught making a contradictory statement.

This claim should be denied in its entirety.

**B. Medical Expert**

Some months after the abuse ceased, H. underwent a medical examination. The State introduced testimony from Dr. Karen Mielke, who did not personally examine H. but reviewed a video of the exam. Dr. Mielke's testimony was consistent with H.'s and did not contradict it, but she agreed she could not prove H.'s testimony was true. *See generally* 3 Trial Tr. at 887:9-893:14, 901:9-12. Choosing not to investigate medical testimony that does not prove the State's case is not unreasonable. Witnesses like Dr. Mielke are presented by the State because the defense will make hay if they are not. St. Germain fails to show that Sather's failure to present her own expert in opposition to Dr. Mielke was unreasonable.

An expert who could *contradict* H.'s testimony would be beneficial, and St. Germain claims to have found that witness. But he has not submitted to this Court

*any* testimony, not even an affidavit, from that expert, only the curriculum vitae of a well-known and competent expert – in pathology – Dr. Bennett. *See* Br. in Supp. Ex. D (doc. 2-4). Further, St. Germain has never allowed the State to cross-examine Dr. Bennett, and Dr. Bennett apparently did not review the video taken during H.'s examination. *See* Order Denying Postconviction Relief at 32-38. The facts St. Germain alleges, even if proved, are not sufficient to show that his expert would have been found qualified to testify on the pertinent subject matter at trial. Nor are they sufficient to show that a reasonable juror could have been persuaded to agree with Dr. Bennett that H.'s injuries were not consistent with her report of events, as opposed to Dr. Mielke, who specializes in living pediatric hymenal and anal tissue's healing or scarring following repeated acute insults over time. *Cf.* Postconviction Hr'g Tr. (doc. 10) at 47:13-54:6, 58:4-17.

This claim meets neither element of the *Strickland* test and should be denied.

## C. Prior Accusation

Finally, St. Germain's claim that H. previously made a "false accusation" of sexual "abuse" against her biological father overstates the scrap of hearsay evidence he offers to support it. Br. in Supp. Ex. A (doc. 2-1). Further investigation may have shown that H. did, in fact, accuse her father; that the allegation was a lie as opposed to a mistake; and that the abuse consisted of physically scarring vaginal intercourse.

But St. Germain alleges no facts suggesting he could support any of these purely theoretical possibilities. This claim should be denied.

## V. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

St. Germain's is a case of truly overwhelming evidence. The State's introduction of Hale's testimony was unquestionably prejudicial. But there was plenty of other compelling and equally damning evidence. There is no reasonable probability that a reasonable juror, presented with all the evidence except Hale's prejudicial statements, would have acquitted St. Germain. St. Germain's other two claims, regarding a medical expert and a "prior accusation," are patently meritless. A certificate of appealability is not warranted.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1.  The Petition (doc. 1) should be DENIED on the merits.

2.  The Clerk of Court should be directed to enter by separate document a judgment in favor of Respondents and against Petitioner.

3.  A certificate of appealability should be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to the Findings and Recommendation within fourteen (14) days.  Any objections must comply with D. Mont. L.R. 72.3.

DATED this 27th day of December, 2012.

 /s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge